UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SARA J. JOHNSON, for KLB,

        Plaintiff,

v.                                 ACTION NO. 2:18cv277

NANCY A. BERRYHILL,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Plaintiff, Sara J. Johnson ("Johnson"), proceeding *pro se*, brought this action on behalf of her minor daughter, KLB, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of Nancy A. Berryhill, the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA"), denying KLB's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 13. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Johnson's motion for summary judgment, ECF No. 15, be **DENIED**, the Commissioner's motion for summary judgment, ECF No. 17, be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

### I.   PROCEDURAL BACKGROUND

On August 11, 2014, Johnson protectively filed an application for SSI on behalf of her minor daughter, KLB, alleging that KLB became disabled on October 11, 2013, due to asthma

with exacerbation, chest pain, allergic rhinitis, and gastroesophageal reflux disorder ("GERD"). R. 22, 25, 110, 163–66, 192.[1] The relevant time period for assessing KLB's conditions begins 12 months before the application date, because this is a child claim under Title XVI, and, to be found disabling, a child's impairments must have lasted or "can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also* SSA Program Operations Manual System ("POMS") DI 25201.001(D) (Nov. 5, 2007).

The SSA denied her application initially on February 11, 2015, R. 96, 98, 111–15, and upon reconsideration on June 17, 2015,[2] R. 109, 119–22. Following the state agency's denial of these claims, KLB requested a hearing before an Administrative Law Judge ("ALJ"). R. 124. ALJ Carol Matula held a hearing on February 8, 2017, at which KLB was represented by Linda Jones-Bailey, a non-attorney representative. R. 22, 42–90. KLB and Johnson testified at the hearing. R. 43. On March 28, 2017, the ALJ denied KLB's claim for benefits, finding that she was not disabled from August 11, 2014, through the date of the decision. R. 22–36.

On April 3, 2018, the Appeals Council denied KLB's request for review of the ALJ's decision. R. 1–6. The Appeals Council noted that Johnson submitted additional medical evidence from: Dr. Cynthia Epstein, dated August 18, 2017, and February 20, 2018; Dr. Thedia Jones Smith, dated May 22, 2017; and Chesapeake Public Schools, dated September 12, 2017. R. 2, 7–15. However, these records did not relate to the period at issue in the ALJ's decision.[3] R. 2.

---

[1] "R." refers to the paper record titled "Court Transcript" transmitted to this Court from the Office of Appellate Operations of the Social Security Administration under a certification page dated August 9, 2018, which is consecutively paginated from 1 through 922.

[2] The ALJ decision states that the reconsideration was denied on July 9, 2015, R. 22, but the disability determination explanation for the reconsideration is dated June 17, 2015, R. 109.

[3] The Appeals Council advised: "If you want us to consider whether you were disabled after March 28, 2017, you need to apply again." R. 2.

Because the Appeals Council denied the request for review, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. R. 1; *see* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 416.1481.

Having exhausted all administrative remedies, Johnson timely filed a motion for leave to proceed *in forma pauperis* with this Court on May 23, 2018, along with her proposed complaint. ECF Nos. 1, 1-1. The Court granted her motion on July 5, 2018, after she submitted a corrected motion, and filed the complaint on the same date. ECF Nos. 2, 3, 4, 5. The *pro se* complaint asserts that the Commissioner's findings were not supported by substantial evidence in the record, and that the evidence instead established that KLB's asthma was disabling. ECF No. 5 at 3, 5. Specifically, it alleges that KLB's asthma prevented her from attending school on a regular basis, resulted "in her having to be homebound," and "caused her to become very depressed." *Id.* at 3.

The Commissioner answered on August 29, 2018. ECF No. 11. In response to the Court's order, ECF No. 14, Johnson filed a letter on October 3, 2018, which the Court construed as a motion for summary judgment, and the Commissioner filed a motion for summary judgment and supporting memorandum on November 8, 2018.[4] ECF Nos. 15–18. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II.   FACTUAL BACKGROUND

### A.   Background Information and ALJ Hearing Testimony

#### 1.   Disability Function Reports

Born in 2002, KLB was 14 years old and attending eighth grade at the time of the ALJ hearing in 2017. R. 46, 48, 163. She was a school age child (between the ages of 6 and 12) in

---

[4] The summary judgment motion included a separately filed notice, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K), providing Johnson with notice of how to timely respond thereto and the potential consequences for failing to do so. ECF No. 19.

2013, when her disability allegedly began, and is now an adolescent (between the ages of 12 and 18). *See* 20 C.F.R. § 416.926a(g)(2). She has never worked. R. 47. She lives with her mother and two older sisters, one age 15 and the other age 26. R. 51–52.

Johnson completed a "Function Report – Child Age 6 to 12" on October 8, 2014, stating that KLB wears glasses, has no problems hearing or communicating, and her ability to progress in learning was not limited. R. 176–80. Although Johnson marked that KLB's physical abilities were not limited, she also noted that KLB could "walk but get short [of] breath," and could not run, jump rope, or play team sports due to asthma. R. 181–82. She noted that KLB's impairments do not affect her "ability to help . . . herself and cooperate with others in taking care of personal needs," and that KLB "[h]elps around the house" but "gets tired or short of breath" and takes breaks. R. 183. Johnson also completed a supplemental disability report on the same date, noting that KLB was restricted from physical education ("PE") class, required emergency room visits, and missed school days because of her condition. R. 187. Another "Disability Report" completed on the same date lists three asthma medications, an allergy medicine, a nasal spray, a medicine for infections, a medicine for chest pains, and an acid reflux medication, all of which were prescribed by the Children's Hospital of the King's Daughters ("CHKD"). R. 191, 194.

Johnson completed another disability report on March 13, 2015, stating that KLB's "condition is getting progressively worse in that she is having more asthmatic attacks" and is "more short of breath with the least amount of exertion." R. 199. She noted that KLB "is becoming increasingly depressed due to the fact that she is unable to do simple chores around the house or do things as other kids do," and that she had increased chest pain. R. 199. She explained that KLB is "very slow" and "unable to walk very far without stopping to catch her breath," and she could not be around fumes, cleaning materials, perfume, or nail polish remover. R. 203. She reported

4

that KLB had to stop while bathing "because the exertion causes shortness of breath," had to "sit down to put on her clothes," and wore a "mask when going outside due to pollen." R. 203.

An August 3, 2015 disability report completed by Johnson reiterated that KLB had shortness of breath and chest pain, even when taking her asthma medication daily, and that she cannot participate in PE class because of her asthma. R. 209–10. A second disability report that month stated that KLB's medical conditions had not changed, but that, since June 2015, she was experiencing new conditions, including "[s]tomach illness and Vitamin D level [that] stays low on top of her shortness of breath[,] we[a]k lungs[, and] chest pains." R. 212.

### 2.     ALJ Hearing Testimony

At the ALJ hearing on February 8, 2017, KLB testified that the school allows her an extra five minutes to move between classes in the one-story school building; she usually only needs two extra minutes, but sometimes takes seven minutes if the class is far away. R. 48–49, 62. She was earning B's to D's "[b]ecause [she is] not in school," and she was allowed home instruction after missing at least three days of school. R. 49–50.

KLB waits until her 15-year-old sister comes home to do their homework together, but she does not need a reminder to do her homework, and she spends "[a]bout the same" amount of time on homework as her peers, and only needs help with it "[s]ometimes." R. 51–52. After homework, she eats dinner and "get[s] ready for the next day" by taking a bath, putting out her clothes, and studying "if there's a test the next day." R. 52. She cleans up after herself and makes her bed every morning, and does not need reminders to take her bath. R. 55–56. For chores, she does not vacuum because it is "too much walking," and does not dust "because the chemicals get[] to [her]," but she helps by making grocery lists. R. 56–57. She takes medications throughout the day that make her "sleepy," but not to the point where has to "lie down and close [her] eyes." R. 60–61.

5

KLB testified that she "can't participate in a lot of physical activities" because of her asthma. R. 53. She helps her PE teacher by keeping scores of other students. R. 59. She does not see her friends on the weekends, but she uses the telephone and social media to talk with them, and instead reads and "hang[s] out" with her family on the weekend. R. 53–54. She cannot "stay with" her family when they go out, because she cannot keep up when they are walking at a normal pace. R. 70. She is depressed about her weight and because she "can't do what normal kids do," although therapy was helping. R. 61. She also feels guilty that she cannot do things with her family, such as go to an amusement park or go outside for her sister's birthday due to her allergy. R. 70–71.

KLB has been "dealing with" asthma for approximately three years, and it has "[g]otten worse" in that time. R. 64. On average, she goes to the emergency room three or four times per month for asthma, where she receives medication and treatment on a "breather machine." R. 65–66. The maximum number of emergency room visits in a month was four, and she also sees Dr. Smith every month or two. R. 67. She has been hospitalized three times in the previous three years, each for a "couple of days," but only two times were due to asthma. R. 71–72. She uses a dance video program for exercise, but takes a 10-minute break to sit down after dancing for approximately two minutes because she has "trouble breathing." R. 55–56, 58. She has "[c]onstant" four- or five-level pain on a scale of ten in the center of her chest caused by asthma, and "[w]alking makes it worse." R. 57. She "get[s] out of breath" and cannot climb stairs. R. 58–59.

Regarding her GERD, KLB testified that she was taking medication, but it was "[n]ot really" under control, and she had to "watch what [she] eat[s]," could not eat spicy foods, and

would "direct throw up after" eating eggs.[5]  R. 57–58.  Her reflux "flares up" "when [her] asthma acts up."  R. 68.

Regarding school, KLB testified that she missed 54 days during the previous school year, and "[a]t least" 20 days "here and there" during the current year.  R. 59.  She had to have home instruction "three or four" times that year, and teachers put her assignments on the internet.  R. 59–60.

Johnson then testified that KLB's asthma medicine caused her to be tired, and that KLB has a "protocol" for five- to ten-minute nebulizer treatments every three to four hours at home, as well as a nebulizer treatment administered by the school nurse before PE class.  R. 75–76.  KLB takes a medicine for shortness of breath every eight hours and Albuterol every four hours.  R. 77.  Johnson maintains control over the medicines and monitors KLB when she takes her medicines to "see if she . . . starts breathing better."  R. 79.

Johnson explained that she and her daughters live in a duplex, and KLB needs to take breaks and catch her breath to climb the stairs to get to the living room and her room.  R. 81.  Johnson stated that KLB was a "smart little girl" who had been an honor roll student, but now "everything is declining" and "[t]hey keep putting her on more and more medicine, higher and higher dose."  R. 80.  She stated that KLB has been hospitalized three times, but "goes to the emergency room just about every week or every other week" due to her asthma.  R. 83.  She explained that the doctors offered her steroids to keep at home for KLB, but she "didn't want to take that responsibility" of administering that type of medication because she was not sure when it was needed.  R. 84–85.

---

[5] A September 29, 2016 allergy management plan lists an allergy to eggs, and provides for an Epipen to respond to a reaction.  R. 713.

## B.    Medical Evidence

### 1.    Hospital Admissions

KLB has been hospitalized three times, all of which occurred after the alleged onset of her disability, and within the year before her application for SSI.

In October 2013, when KLB was 10 years old, she was hospitalized for the first time at Georgia Children's Hospital for an asthma exacerbation triggered by mold exposure. R. 269, 342–46. She was admitted on October 21, and discharged on October 23, 2013. R. 342, 346. The hospital noted that she "has a history of asthma that is well controlled on daily QVAR and albuterol." R. 342. A pulmonary function test "showed a baseline obstructive disease secondary to asthma and remarkable improvement after albuterol treatment." R. 346.

On April 29, 2014, KLB was admitted to observation in the Chesapeake General Hospital after being treated in its emergency department for an allergic reaction to IVP dye after a CAT scan for her ongoing chest pain. R. 257–58. The admission notes state that KLB had flushed cheeks and swelling, but no shortness of breath or difficulty breathing. R. 260. The physical examination notes indicate that she had no respiratory distress and had 100 percent oxygen saturation on room air, and she was discharged the following day in stable condition. R. 258.

On the evening of July 14, 2016, KLB was admitted to CHKD for severe persistent asthma with exacerbation, rash, and hives, which had continued for several days and had not been resolved by clinic visits on July 9, 11, 12, and 14. R. 785. The admission notes state that KLB had "shortness of breath despite outpatient steroid, albuterol, and atrovent treatment," but her respirations were unlabored and she had 100 percent oxygen saturation on room air. R. 786. The etiology of her rash was uncertain, but possibly due to an egg allergy. *Id.* The doctors planned to continue her on her home medications, except for Qvar because "it does not appear that she has

8

been taking it regularly," and also prescribed Albuterol, Atrovent, and Solumedrol. R. 787.

The next day, July 15, KLB "felt more comfortable and denied pain" after Albuterol and Atrovent treatment. R. 805. On July 16, the doctors reduced her steroid dose, and resolved her evening episode of chest pain and tachypnea with Albuterol treatment. R. 805. KLB was "deemed stable to return home with follow-up" on July 17, and discharged from the hospital on that date. R. 805, 807.

### 2.    Emergency Room and Urgent Care Visits

KLB had nine emergency room or urgent care visits between late 2013 and early 2017, with three visits in 2014, no visits in 2015, and four visits in 2016.

On December 16, 2013, KLB was treated in the emergency department of Chesapeake General Hospital for an asthma flareup with shortness of breath, audible wheezing, and productive cough, which occurred after she ran out of Albuterol nebulizer solution. R. 264. The physicians noted "[n]o respiratory distress," and that she had 100 percent oxygen saturation on room air. R. 264–65. The doctors administered a nebulizer treatment "with much improvement of her symptoms," and discharged her in stable condition with instructions to "use her albuterol inhaler and nebulizer machine at home as directed as needed for wheezing or difficulty breathing." R. 265.

On August 5, 2014, KLB was treated in the emergency department of Chesapeake General Hospital for chest tightness and shortness of breath. R. 250. The physicians noted "[n]o respiratory distress," that she had 100 percent oxygen saturation on room air, and she was "able to speak full complete sentences without difficulty." R. 250–51. The physician noted that she "[w]ill provide a nebulizer treatment," and provided KLB oral ibuprofen for pain, but concluded that further chest x-rays were not necessary because "previous imaging studies have been

9

unremarkable" and the EKG to "rule out possible arrhythmia as cause of her chest discomfort . . .
was unremarkable." R. 251. KLB was discharged several hours later on the same date in stable
condition. R. 250–52. KLB returned several weeks later, on August 30, 2014, with the same
symptoms, and was discharged several hours later after the same treatment. R. 246–47.

On October 27, 2014, KLB was treated in the CHKD emergency department for chest pain.
R. 353, 412. Her "review of systems" at that time reported no shortness of breath, coughing, or
wheezing. R. 353. Her pain "resolved" after administration of a "GI cocktail," and she was sent
home. R. 355.

On July 9, 2016, KLB visited the CHKD urgent care clinic for "concerns of intermittent
cough and wheezing and hives" after exercising the previous day, and KLB was "complain[ing]
of no chest pain but states she feels like she is wheezing and a little short of breath." R. 751–52.
She was told to use her Albuterol "aggressive[ly]," every four hours while awake, over the next
24 to 48 hours, and 10–15 minutes before exercise. R. 753. She was given DuoNeb during the
visit, which completely resolved her wheezing and chest pain. R. 753. KLB returned for a visit
on July 12, 2016, for difficulty breathing, and was told to follow up with her primary care
physician. R. 756–57, 766–68.

On November 9, 2016, KLB visited the CHKD urgent care clinic for asthma, after she had
a "cough, chest tightness or wheezing" for three days. R. 726. She was instructed to take Albuterol
every four to six hours for five to seven days. R. 727. On November 21, she returned to the clinic
for "cough, wheezing and chest tightness since yesterday." R. 818–19. She was instructed to use
Albuterol every four to six hours for five to seven days and follow-up with her pediatrician. R.
820.

On January 28, 2017, KLB was treated in the CHKD emergency department for asthma,

10

and told to follow up with her doctor in two days. R. 854.

### 3.    Other Doctor Visits and Medical Records

#### a.    Records from 2012 and 2013

In 2012 and 2013, the records reflect eight visits to CHKD and Dr. Michelle Curry, with some asthma flare-ups when KLB was not compliant with daily Advair medication, but improvement after Albuterol treatment. R. 375–83. The reports from several visits state that KLB had no new symptoms and was "doing better." R. 377–78.

#### b.    Records from 2014

In 2014, KLB had approximately sixteen doctor visits, of which six were follow-up visits with no new concerns, one was an evaluation, and two noted non-compliance with her medications.

A CHKD visit on February 12, 2014, reported that KLB complained of "weakness and chest hurting in school exacerbated by activity," and "mom reports child[']s SOB [shortness of breath] is severe that school nurse has noticed child gets [shortness of breath] with activity." R. 372. The same report noted that KLB "[h]asn't been really using Advair consistently," and that she was prescribed one puff of Advair twice daily. R. 372, 374.

KLB saw Dr. Curry on March 4, 2014, for a sore throat, wheezing, stomach ache, and headaches. R. 477–78. A CHKD follow-up visit on March 10, 2014, reported that KLB's "spirometry numbers [were] lower" because she was "not compliant at this time" with her Advair prescription, and she was given Albuterol the day before for wheezing. R. 370. A follow-up eight days later reported that KLB had fatigue and chest pain "for a while now," and it is "a little hard to breath[e] when there is no chest pain but moreso with chest pain." R. 368.

On April 14, 2014, KLB saw Dr. Epstein in CHKD's Pediatric Pulmonology Clinic. R. 269–70. Dr. Epstein noted that KLB had a "history of chest pain" since October 2013, and "has

11

been missing significant amount of days of school secondary to crying associated with being in pain," and also could not do activities at home due to pain. R. 269. She noted that KLB was last treated with oral steroids in October 2013, and had no emergency room or hospital visits since that time. R. 269. KLB was 11 years old at the time, and in the 97th percentile for weight and 10th percentile for height. R. 269. She had 100 percent oxygen saturation on room air, and Albuterol treatment produced a "statistical significant change" in her pulmonary function. R. 270. Dr. Epstein prescribed two puffs of Advair twice daily for her asthma and "continuing albuterol as needed," as well as nasal steroids and Zyrtec for allergic rhinitis and Naprosyn for pain associated with costochondritis. R. 270. A follow-up visit two months later reported that KLB had no new concerns, although she needed Albuterol twice weekly "for wheezing since it got very hot out," and she still had pain in her chest. R. 367.

On August 7, 2014, KLB saw Dr. Epstein in the CHKD Pediatric Pulmonary Clinic, two days after an emergency room visit. R. 272–73. Dr. Epstein reported that KLB "is trying to exercise and walk, but she is unable to do so secondary to pain," she has "intermittent episodes of coughing and wheezing which has been worse over the past several days associated with her [asthma] flare," and she "has not been on prednisone." R. 272. KLB had 100 percent oxygen saturation on room air, and her pulmonary function testing showed "a mild obstructive pattern with a decline in her flows since her last effort" and "despite her medium strength inhaled steroid therapy." R. 272. Dr. Epstein increased KLB's Advair dosage, but did not change the frequency. R. 273. Dr. Epstein noted that KLB "has a history of chest pain for which the etiology remains unclear." R. 272.

A CHKD follow-up visit four days later, on August 11, 2014, reported that KLB experienced shortness of breath that morning and "started coughing when she got here," but she

12

was given Albuterol via a nebulizer "after which the lungs were clear." R. 365–66. A follow-up two weeks later reported that KLB complained of chest pain "but no cough, shortness of breath or difficulty breathing," and that she was taking the Advair as prescribed and had not needed Albuterol since her last visit. R. 363.

KLB saw Dr. Epstein again on September 4, 2014, and reported that, since an emergency room visit several days earlier, KLB's "significant shortness of breath has resolved and she is back to her baseline chest pain and shortness of breath with exertion." R. 274. Dr. Epstein further noted that KLB had 100 percent oxygen saturation on room air, and her pulmonary function testing showed "a significant improvement since her last effort and best lung function she has had;" due to that improvement in pulmonary function, Dr. Epstein saw "no reason to take a course of oral steroids" which had been prescribed, but not administered, after KLB's last emergency room visit. R. 274. KLB "continues to have chest pain daily for which she is not able to participate in activities." R. 274. A CHKD visit on September 24, 2014 reported "[n]o new concerns today," and that KLB was "walking daily" with her mom "and also around the track at school." R. 362.

On October 8, 2014, KLB saw Dr. Epstein for "followup of ongoing chest pain, severe persistent asthma, and chronic cough." R. 278. Her pulmonary function testing showed "a mild obstructive pattern with an improvement in her flows since her last effort." R. 278. Dr. Epstein noted that KLB's "physical education remains limited and she seems to do okay with that," and that she was using Albuterol twice daily. R. 278. For asthma, Dr. Epstein prescribed two puffs of Advair twice daily and Albuterol every four hours as needed, and for possible GERD, she prescribed a trial of Prilosec. R. 278.

On October 29, 2014, Dr. David Darrow evaluated KLB at the request of Dr. Curry. R. 413–14. He reported that KLB had an adenotonsillectomy when she lived in Georgia, and he

13

"performed a flexible fiberoptic assessment of [her] airway" and found "some residual adenoid tissue that was nonobstructive." R. 413. He recorded that KLB was already scheduled for a sleep study for possible apnea and for a polysomnogram regarding possibly obstructive residual lymphoid tissue, and further recommendations could be made once those results were obtained. R. 413. Finally, he observed that KLB has a "history of daytime behavioral issues including poor school performance, inattentiveness and irritability," and that she "gained a substantial amount of weight in the past couple of years." R. 413.

KLB saw Dr. Epstein on October 30, 2014, three days after visiting the emergency room for severe chest pain. R. 280, 353. Dr. Epstein noted that KLB "has severe persistent asthma with improvement in pulmonary function over time on high dose inhaled steroid therapy," but she "continues to complain of shortness of breath and inability to do simple things like walking" or "keep[ing] up with her family in walking normal." R. 280. Dr. Epstein recommended a trial of Carafate for KLB's chest pain and shortness of breath "possibly related to reflux." R. 281.

On December 2, 2014, KLB visited Dr. Curry for a cough and low-grade fever, as well as chest and stomach pain. R. 466. KLB had been using Albuterol every four hours for the prior two days. R. 466. Three weeks later, KLB visited Dr. Curry for a follow-up on her asthma and a sinus infection the prior week. R. 464. KLB "was using the Albuterol every 4 hours initially after the last visit but has not needed to use it recently," and she did not have "as much" chest pain. R. 465. Her asthma medications remained the same. R. 465.

### c.    Records from 2015

In 2015, KLB had approximately sixteen doctor visits. Three visits were asthma follow-ups with no cough or wheezing, one was a consultation with a gastroenterologist, one was a bronchoscopy, one was an impedance probe test, one was an EGD test, and three were GERD-

related for nausea and vomiting.

Dr. Michael Konikoff, a gastroenterologist, had a consultation with KLB on January 5, 2015. R. 417. He noted that she complained of daily chest pain, "nausea but infrequent vomiting," and "frequent regurgitation with occasional acid brash." R. 417. He concluded that GERD "could explain" her symptoms, but the lack of improvement on Prilosec and chest pain with palpation "would favor costochondritis or an alternative etiology," so he planned to continue her Carafate medication and perform an upper GI endoscopy ("EGD") to rule out possible causes of her symptoms. R. 418. An EGD on January 19, 2015, revealed "[s]everal small gastric erosions with normal appearing esophageal mucosa." R. 420. KLB also underwent a bronchoscopy with bronchioalveolar lavage on the same date, which revealed clear mucus and produced samples to be analyzed. R. 420–26.

On February 23, 2015, KLB had a follow-up visit with Dr. Epstein. R. 428–29. Dr. Epstein noted that KLB had a "significant episode of wheezing about 10 days ago" that was treated with Albuterol, she returned to using Albuterol as needed, and "currently has no coughing, wheezing or shortness of breath." R. 428. She had "good and bad days with her chest pain" and "occasional reflux symptoms." R. 428. She was not participating in PE class, but remained an honor roll student despite missing 25 to 30 days of school. R. 428.

On March 4, 2015, KLB visited Dr. Curry and reported that she "has been coughing and her asthma has been flaring up"; she was also "exercising more and has been exercising 5 minutes at a time so she is not short of breath." R. 463. She had recently run out of her medications and refilled them two days before the doctor visit. R. 463. She was told to "[c]ontinue the Advair daily and Albuterol as needed." R. 464.

On April 6, 2015, KLB saw Dr. Curry for "congestion" and reported that she recently

15

missed a whole week of school due to fever, chest pain and stomach ache, and "was wheezing then as well." R. 461. She "has PE in school but just walks," and her "[s]pirometry [was] good except for low FEF 25-75." R. 461–62. Dr. Curry maintained her asthma medication and provided recommendations to address her morbid obesity. R. 462–63.

KLB had a follow-up gastroenterologist visit on May 4, 2015, where she reported continued chest pain as well as abdominal pain, daily nausea, and twice-weekly vomiting. R. 431, 433. KLB also saw Dr. Epstein on May 11, 2015, noting the same symptoms, and that she "missed a week of school secondary [to] viral illness" that started her vomiting. R. 435. Dr. Epstein did not change KLB's asthma medication. R. 435.

On June 15, 2015, KLB underwent an impedance probe test related to her GERD symptoms, which was "positive for severe reflux with prolonged episodes," and her "reflux events seem to correlate with her symptom of abdominal pain but not chest pain." R. 567, 574.

On June 25, 2015, KLB visited Dr. Epstein for a follow-up of chest pain, GERD, and asthma, and reported that her chest pain had not changed, she had increased cough and wheezing, and used Albuterol two to three times per week. R. 530–31. Dr. Epstein noted that KLB has severe persistent asthma, for which she recommended continuing current medications, as well as severe GERD. R. 530–31. Dr. Epstein completed an "asthma action plan" for KLB, outlining medications and procedures to both control KLB's asthma and respond in "rescue" situations, such as when to use an inhaler. R. 402. Dr. Epstein did not check any of the boxes to indicate the severity of KLB's asthma or identify any triggers (such as exercise) that would make her asthma worse. R. 402. During follow-up visits with CHKD on July 27 and August 10, KLB reported no shortness of breath or difficulty breathing, and that she was taking Advair as prescribed and had not needed Albuterol recently. R. 533, 661.

16

On August 24, 2015, KLB had a follow-up visit at CHKD for GERD. R. 556. The doctor noted that she had "severe gastroesophageal reflux with correlation of her reflux with abdominal pain, but not chest pain," and adjusted her reflux medications. R. 556–57.

At a September 16, 2015 follow-up, Dr. Epstein reported that "[s]ince [KLB's] last visit in June, her asthma has been more symptomatic," with daily coughing, wheezing, shortness of breath, and chest pain, but no emergency room or hospital visits or steroid treatments. R. 641–42. She had "no significant change since her last" pulmonary function test. R. 641. Dr. Epstein recommended no change in her asthma medications, but prescribed Prednisone "if needed." R. 642.

On September 28, 2015, KLB had an EGD test to evaluate her chest and abdominal pain and reflux symptoms; the test revealed multiple small gastric erosions. R. 643.

On November 12, 2015, KLB visited Dr. Epstein, and reported that, since September, she had no emergency room visits or hospitalizations, and that she had "good weeks and bad," as she would "cough and wheeze multiple times a day for about a week and then she will seem to get better;" the cause was "unclear," but "weather change is certainly a contributing factor." R. 602–03. Dr. Epstein noted that KLB "missed up to 3 weeks of school secondary to worsening symptoms," and that she "had increasing abdominal symptoms over the past week with abdominal pain and increasing reflux." R. 602. Pulmonary function testing revealed "a slight improvement since her last effort." R. 602. Dr. Epstein concluded that KLB had "severe persistent asthma for which she is having chronic exacerbations, allergic rhinitis," GERD, and chronic chest pain. R. 603.

On December 21, 2015, KLB visited a gastroenterologist, and reported improvement in her abdominal pain. R. 620. She also reported persistent vomiting, usually every few days

17

approximately an hour after meals, and she "often has an asthma attack after the vomiting." R. 620. She further reported chest pain, difficulty breathing, and shortness of breath during exercise. R. 620.

### d. Records from 2016

KLB had approximately fifteen doctor visits in 2016, of which four were asthma follow-ups that noted no shortness of breath, one was an allergy test, and four were gastroenterologist visits for stomach pain and vomiting.

Dr. Konikoff examined KLB on January 11, 2016, for abdominal pain one or two times per week that is "less severe since starting amitriptyline," although she still had frequent nausea and vomiting, and she "recently had emesis and hives after egg consumption." R. 627.

On January 18, 2016, KLB visited Dr. Epstein for severe persistent asthma, chronic chest pain, and GERD. R. 599–600. She had a pending allergy appointment regarding her vomiting, which triggered her asthma and increased her coughing and wheezing frequency. R. 599. She was using Albuterol twice weekly, had no emergency room visits or hospitalizations, was not taking oral steroids, and had 100 percent oxygen saturation on room air, but had "missed over 10 days of school secondary to these multiple medical problems." R. 599. Dr. Epstein increased her Qvar asthma medication dosage. R. 600.

On February 8, 2016, KLB saw Dr. Smith about her blood pressure, but noted that her "asthma has been better recently" and she did not have any chest pain, shortness of breath, nausea, or vomiting. R. 655, 657.

KLB saw Dr. Curry on March 10, 2016, because "her asthma is acting up" and she had "increased asthma symptoms, wheezing, cough, and chest tightness," even though Dr. Epstein had KLB on Albuterol treatments every four hours. R. 653. She also had chills, a stuffy nose,

18

headaches, and a sore throat. R. 654.

On March 24, 2016, KLB visited Dr. Epstein, after she experienced "significant increased symptoms of cough and wheezing and was not responding to oral steroids" a week prior, but KLB was "feeling much better," with no coughing, wheezing, nasal congestion, or vomiting in the past week. R. 617, 623 (notes from March 13, 2016 visit). She had 100 percent oxygen saturation on room air. R. 617–18.

Dr. Konikoff examined KLB on April 4, 2016, for abdominal pain three times per week and nausea and vomiting twice weekly. R. 614. Her symptoms had somewhat improved on high-dose acid suppression. R. 615.

On April 15, 2016, Dr. Smith reported that KLB and her mother had "continued concerns over frequent recurrence of chest pain and abdominal pain" that is "preventing her from doing what she wants or needs to do." R. 652. Dr. Smith noted that KLB was morbidly obese, and continued all asthma medications as prescribed. R. 653. At a follow-up visit on June 22, 2016, KLB denied any recent shortness of breath, and reported that she was taking the asthma medications as prescribed and "exercising more as tolerated." R. 662–63.

On June 27, 2016, Dr. Konikoff examined KLB, and reported that she "has done reasonably well" since her April visit, but still had abdominal pain twice weekly, and still had nausea and vomiting once or twice a week after meals. R. 892. He planned to wean her off amitriptyline because KLB felt more depressed when taking it. R. 893.

On June 29, 2016, KLB visited CHKD for an asthma follow-up, and reported improvement in her chest pain, coughing and wheezing once or twice per week, using Albuterol once or twice per week, and that she had "been doing more activity, some shortness of breath with activity but is able to participate." R. 897.

19

On September 28, 2016, KLB had an allergy test, and the next day, the evaluating doctor signed a form indicating KLB had an allergy to eggs. R. 713, 841, 843, 846.

On November 2, 2016, KLB visited Dr. Epstein for a follow-up visit, and reported that she had been stable until five days prior, "when she started developing increased coughing and wheezing for which her symptoms have only modestly improved." R. 838. KLB "seems to not have significant shortness of breath," had no GERD or abdominal pain symptoms, and was "doing light walking," but "not participating in full physical education." R. 838. There was a "dramatic improvement in her flows" during pulmonary function testing after administration of albuterol. R. 838. Dr. Epstein prescribed use of KLB's asthma "sick plan" for 5 days and changed from Atrovent to Spiriva. R. 839.

On November 14, 2016, she saw Dr. Konikoff, who reported that she had done "reasonably well" since her June visit, but that her symptoms had recently worsened, with "daily nausea and vomiting a few times in the past week." R. 746. The doctor noted that her "GI symptoms seem to worsen during asthma exacerbations, and she feels her asthma is worsening now." R. 747.

Dr. Smith saw KLB on December 7, 2016 for her asthma and weight, and reported that her GERD medicine was not working well. R. 657. KLB had an asthma treatment that morning, and Dr. Smith increased the number of puffs of Qvar for KLB to take in the event of an asthma flare. R. 657.

### e.   Records from 2017

On January 23, 2017, KLB visited Dr. Epstein because she had been coughing and wheezing for the prior three or four days. R. 864. She had been taking Albuterol every four hours, and had "ongoing shortness of breath with activity." R. 864. Dr. Epstein provided Albuterol and Atrovent, and KLB's "lung exam improved," so she prescribed using Atrovent in a nebulizer at

home every eight hours to alternate with the Albuterol in an effort to "avoid a course of oral steroids." R. 864–65.   On January 30, 2017, Dr. Smith wrote a note excusing KLB from school for a week and providing for homebound instruction, following an asthma exacerbation visit on January 26. R. 852.

## C.     School Records

A student academic profile from KLB's middle school, provided in November 2014, reports her grades and attendance since 2010. R. 282–84. In the 2010–2011 school year, she was absent 15 days, and no grades were included in the report. R. 283–84. In the 2011–2012 school year, she was absent 6 days, and received three B's and one C.  R. 283–84.  In the 2012–2013 school year, she was absent 23 days, and received three B's and one D.  R. 283–84.  In the 2013–2014 school year, she was absent 25 days, and received three C's and one D.  R. 283.  A record from the end of the 2014–2015 school year reflected that she was absent 39 days, and received two A's, two B's, and one C.  R. 401.  In the spring of 2016 (January through May), she was absent 29 days, and either tardy or left early for medical reasons on 7 other days.  R. 720–23.  Her final grades for the marking period that ended in June 2016 were an A, three B's, a C, and a D.  R. 862.

A student health information form from CHKD, dated November 12, 2015, lists a diagnosis of severe asthma with a variety of triggers, including exercise and weather changes, and provides for several accommodations, including:    medication during the day; warms-ups before exercise/PE; a waiver for absences in excess of ten days per semester; and intermittent homebound services as needed.  R. 714.

A September 9, 2016 letter approved homebound instruction for KLB for the 2016–2017 school year.  R. 861.  The letter explained that homebound services would be provided as needed after the student was "absent for three (3) consecutive days due to his/her chronic illness." R. 861.

### D. Depression-related Records

KLB began treatment with Christian Psychotherapy Services on May 11, 2016. R. 710. The therapist did not speak with KLB during the intake interview because KLB was not feeling well. R. 710. Johnson described KLB's symptoms to the therapist, including her "depressive symptoms which she believes are a result of [KLB's] disability." R. 710.

At her visit on August 10, 2016, the counselor described KLB's functional status as "[m]oderate impairment in social and educational functioning," and reported "depressive symptoms due to her hospitalization and medication." R. 708. She was cooperative with treatment, and after discussing her negative cognitions, such as feeling like a burden to her mother, she discussed ways to focus on strengths and reframe negative beliefs. R. 708. KLB missed appointments scheduled for July 11, September 9, and October 3 and 24, 2016. R. 709, 834–36.

### E. Treating Physician Opinion Letters

On September 17, 2015, Dr. Epstein wrote a letter on behalf of KLB, explaining that KLB had "severe persistent asthma, persistent ongoing chest pain, and GERD," had "been severely negatively impacted by her asthma and chest pain," and fulfilled the "first criteria for [listing] 103.03 C as indicated by the chest x-ray result," although she did not explain the x-ray findings to support that conclusion  R. 543. An x-ray report dated the previous day states that KLB has "[b]ronchial wall thickening, without focal pneumonia" and "[e]vidence for mild bilateral air trapping. Findings may reflect viral process, versus exacerbation of reactive airways disease." R. 544.

On May 20, 2016, Dr. Smith wrote a letter stating that KLB had chronic asthma, GERD, and a recent depression diagnosis. R. 706. She noted that the "asthma and reflux has caused her to miss a significant amount of school in addition to adversely affecting her social and family

22

interactions," and she felt it contributed to the depression diagnosis "because of the days missed from school and the inability to do the things she would like to do with both family and friends." R. 706. She concluded that this "is a chronic condition that is being managed by both us as a practice and also by the specialists and while we certainly hope that she will reach a point where she is free of symptoms, we have not achieved that goal at this time." R. 706.

Dr. Epstein wrote another letter regarding KLB on September 5, 2016, recounting that KLB was "recently hospitalized at CHKD" from July 14 to 17, 2016, for "status asthmaticus that failed outpatient management," and generally listing KLB's "numerous appointments to multiple specialists including: Pulmonary, Allergy/Immunology, Gastroenterology, Speech therapy, and Rheumatology." R. 712. Dr. Epstein concluded: "Functionally, she is unable to walk stairs effectively at school secondary to severe shortness of breath that causes her to crawl up the stairs." R. 712.

## F.   State Agency Physician and Psychologist Opinions

On February 11, 2015, state agency physician Joseph Duckwall, M.D., opined that KLB was not disabled based on his review of her medical records. R. 96–98. He concluded that her "condition results in some limitations in the ability to function, but those limitations are not severe enough to be considered disabling." R. 96. He noted that the allegations were "partially credible," because KLB "does have asthma, however the medical evidence shows that her medications are helping to control her symptoms." R. 96.

On June 16, 2015, state agency physician Pamela Duff, M.D., considered the child listings for asthma and motor dysfunction, and opined that KLB was not disabled based on her review of the medical records. R. 105, 107, 109. She rated KLB as having "no limitation" in three of the six child domain evaluations (acquiring and using information, attending and completing tasks,

23

and interacting and relating with others), and "less than marked" limitation in the remaining three domains (moving about and manipulation of objects, caring for herself, and health and physical well-being). R. 105–06. She noted that limitations in the "moving about" domain "are primarily due to morbid obesity," and that KLB did not have a diagnosis of exercise-induced asthma. R. 106. The "limitations are not severe enough to be considered disabling." R. 108.

Part of the June 16, 2015 determination was completed by Daniel Walter, Psy. D. R. 106. In the third domain of interacting and relating with others, the determination notes that Johnson "reported that [KLB] is becoming more depressed due to not being able to do things other kids do, due to her asthma," but she was not in special education classes, and in the fifth domain of caring for herself, the report noted that KLB had friends. R. 105–06. The report also stated in the "mental" category that KLB was "diagnosed with an unspecified adjustment reaction," but she was not in counseling, and her exams were within normal limits. R. 104.

On July 9, 2015, state agency physician Susan Clifford, M.D., reviewed the June 16, 2015 findings, and agreed with Dr. Duff's conclusion that KLB did not meet, medically equal, or functionally equal a listing. R. 503–05.

## III.   THE ALJ'S OPINION

To evaluate KLB's claim for SSI, the ALJ followed the sequential three-step analysis set forth in the SSA's regulations for determining whether a child under the age of 18 is disabled. *See* 20 C.F.R. § 416.924. Specifically, the ALJ considered whether KLB: (1) was engaged in substantial gainful activity; (2) had a severe impairment or a combination of impairments that is severe; and (3) had an impairment or combination of impairments that meets or medically equals the severity of a listing, or that functionally equals a listing. R. 23. The ALJ noted that, "[a]lthough [SSI] is not payable prior to the month following the month in which the application was filed (20

24

CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912(d)." R. 22.

At step one, the ALJ found that KLB had not engaged in substantial gainful activity since her application on August 11, 2014. R. 25. At step two, the ALJ found that KLB had three severe impairments: asthma, GERD, and obesity. R. 25. The ALJ also noted that KLB had "medically determinable impairments" that "cause no more than minimal functional limitation and are, consequently, nonsevere," in particular: costochondritis, for which there was "no supporting objective evidence"; allergic rhinitis, with no indication that it "cause[d] any loss of functioning"; and depression, which was "being treated conservatively with therapy and requires no medication." R. 25. The ALJ further found that KLB did not have "any mental functional limitations," and that her "functional limitations appear to stem solely from her physical impairments." R. 25.

At step three, the ALJ found that KLB did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment in three categories: respiratory system (section 103.00), asthma (section 103.03), and digestive system (section 105.00). R. 25. The ALJ considered KLB's body mass index over 30 as "consistent with obesity," but concluded that, even when that factor was considered in conjunction with the other impairments, KLB did not "fulfill the requirements of any medical listing." R. 25–26.

The ALJ also determined that KLB did not have an impairment or combination of impairments that functionally equals the severity of the listings. R. 26. In making this determination, the ALJ considered several sources of opinion evidence. She considered the report of KLB's pulmonologist, Dr. Epstein, which was given "significant weight because it is consistent with the medical evidence, but is very limited in its scope." R. 28. She considered the report of

25

the treating physician, Dr. Smith, that KLB's "asthma and reflux adversely affect her social and family interactions," and that those conditions contribute to her depression because they cause her to miss school and activities with friends and family. R. 28–29. The ALJ gave this opinion "some weight because it is consistent with the evidence, but [noted that KLB's] depression is deemed to be non-severe and the opinion is very limited in its scope." R. 28–29. She also considered the opinions of SSA's medical and psychological consultants, which were given great weight. R. 29. The ALJ also evaluated KLB as a "whole child" regarding her "functions in all settings and at all times, as compared to other children the same age who do not have impairments." R. 26.

As the last part of step three, the ALJ assessed KLB's functioning in six functional equivalence domains. R. 23, 26. First, the ALJ found no limitation regarding acquiring and using information. R. 30. She found that KLB's "mental abilities are not limited by her physical impairments and her depression has not interfered with her ability to do age-related activities," KLB had "no history of special education or need for academic accommodations," and KLB earned good grades, typically A's, B's and C's, in the regular classroom" despite missing "a lot of school." R. 30.

Second, the ALJ found no limitation in attending and completing tasks. R. 31. She found that KLB "appears to be disciplined and self-motivated," completes her homework "and does not need assistance or reminders," has "no problems with attending and completing assignments in school," and "does well in managing her time and planning and organizing her day, as she prepares for the next day after dinner by taking her bath, laying out her clothes, and studying for any tests she may have." R. 31.

Third, the ALJ found "less than marked limitation in interacting and relating with others." R. 32. She noted that KLB "is unable to participate in all activities at school due to her shortness

26

of breath and exertional dyspnea," "cannot walk far, run, jump, or play like other children her age," and "does not go out on weekends [with friends from school] because of her inability to keep up," but also concluded that KLB "does not appear to have any limitation in social skills" and "has no behavioral problems and none of her impairments cause problems with communication." R. 32.

Fourth, the ALJ found that KLB has "less than marked limitation in moving about and manipulating objects." R. 33. She noted that KLB is "unable to participate in PE classes at school, climb stairs, run, and engage in a variety of other exertional activities due to shortness of breath and chest pain, and she is slower in walking than her peers," and that Johnson "reports that [KLB] has difficulty with bathing and performing personal care activities, as she has to stop to catch her breath." R. 33.

Fifth, the ALJ concluded that KLB has "less than marked limitation in the ability to care for herself." R. 34. She noted that KLB is "independent in self-care," although Johnson reports that KLB takes breaks due to shortness of breath, and that Johnson regulates KLB's medication and "is not comfortable with administering steroids, so she takes [KLB] to the ER when her asthma becomes severe." R. 34.

Sixth and finally, the ALJ concluded that KLB has "marked limitation in health and physical well-being." R. 35. She noted that the "medical records confirm that [KLB] has pain and breathing limitations" and "takes medication for her asthma" that reportedly makes her "feel tired, but she does not appear to be fragile and still performs well in school despite excessive absenteeism." R. 35. KLB's "asthma attacks do not occur frequently; she is able to control symptoms fairly well with medications given at home, but occasionally requires urgent care visits and courses of oral steroids," and her November 2016 pulmonary function tests "showed dramatic improvement in her flows after administration of Albuterol." R. 35. KLB reported that

27

"medications control her [GERD] symptoms." R. 35.

The ALJ concluded that KLB was not disabled since the application date of August 11, 2014, because she did not "have an impairment or combination of impairments that result in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning."[6] R. 35–36.

## IV. SUMMARY JUDGMENT MOTIONS

In her October 3, 2018 motion for summary judgment, Johnson contends that KLB has endured "tremendous medical problems" for 14 years that have "severely impacted her daily living, socialization with peers, as well as her mental/physical well-being." ECF No. 15 at 1. She asserts that KLB is diagnosed with chronic asthma, hypertension, gastroesophageal reflux, and glaucoma. *Id.* Since elementary school, KLB has received home instruction under a "504 Plan" as an accommodation when her illness has prevented her from attending school.[7] *Id.* KLB takes Albuterol treatments every four hours on a daily basis, and also takes 30 ml steroids daily. *Id.* at 2. The steroid use caused increased weight and blood pressure, including hypertension in May 2018 when her blood pressure was 140/100, as well as glaucoma, resulting in surgery on one eye on July 23, 2018, and her other eye on July 30, 2018. *Id.* at 2. KLB was hospitalized on August 16, 2018, and had a Nissen fundoplication for her chronic acid reflux. *Id.*

---

[6] For SSI claims under Title XVI, eligibility for payments cannot begin before the application effective date. *See* POMS Section SI 00601.009(B) (July 24, 2018).

[7] A 504 plan is adopted pursuant to section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794, which provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A 504 plan differs in some respects from an individualized education plan ("IEP") under the Individuals with Disabilities in Education Act, codified at 20 U.S.C. §§ 1400, *et seq*. For example, a 504 plan has a broader definition of disability than an IEP, and also has fewer rigid requirements in its application.

In response, the Commissioner argues that substantial evidence supports the findings that KLB did not meet, medically equal, or functionally equal a listed impairment. ECF No. 18 at 17–24. She also asserts that Johnson's motion asserts facts outside the relevant time period for evaluating KLB's disability, namely August 11, 2014, through the ALJ decision on March 28, 2017. *Id.* at 16–17.

## V.  STANDARD OF REVIEW

In reviewing a decision denying benefits, this Court will "uphold the [Commissioner's] determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012) (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance" of evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514,

29

517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate when either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law.  *Coffman*, 829 F.2d at 517.

## VI.   ANALYSIS

To be entitled to receive SSI benefits, a child must be disabled due to "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); *see also* 20 C.F.R. § 416.906.  SSA regulations set forth the three-step process for evaluating child disability claims:  (1) whether the child is engaged in "substantial gainful activity"; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment listed in the regulations.  20 C.F.R. § 416.924(a). At the third step, a finding of functional equivalence will be made when a child has an "extreme" limitation in one domain of functioning or "marked" limitations in at least two domains. 20 C.F.R. § 416.926a(a), (d).

In her filing construed as a summary judgment motion, Johnson recounts KLB's health issues, including events that occurred after the ALJ opinion, but she does not identify undisputed facts that establish any error on the part of SSA.  ECF No. 15.  Mindful of its obligation to liberally construe a *pro se* plaintiff's brief, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam), the Court will assess the ALJ's decision to determine whether it contains any errors of law and is supported by substantial evidence in the record.

A.      **Step One — KLB has not engaged in substantial gainful activity.**

It is undisputed that KLB, an adolescent child, has not engaged in substantial gainful activity, as described in 20 C.F.R. §§ 416.924(b), 416.972(a) and (b).  The ALJ's finding at step one is supported by substantial evidence.

B.      **Step Two — The ALJ did not err in determining KLB's severe impairments.**

The second step in assessing SSI eligibility requires consideration of whether the claimant suffers from "a medically determinable impairment(s) that is severe," as opposed to a "slight abnormality or a combination" thereof causing "no more than minimal functional limitations." 20 C.F.R. § 416.924(c).  SSA determines whether an impairment is "severe" by considering all relevant information of record, including information from medical and nonmedical sources, and examining how any alleged impairment limits and restricts a claimant's mental and physical health and functioning on a daily basis, in light of the claimant's age.  20 C.F.R. §§ 416.924a, 416.924b(a)(1).

The ALJ's finding that KLB's asthma, GERD, and obesity constitute severe impairments is supported by substantial evidence. R. 25.  Agency physicians, Dr. Duckwall and Dr. Duff, concluded that her asthma was severe, and Dr. Duff concluded that her obesity was also severe. R. 94, 104–05.  Dr. Duff noted that KLB's January 2015 EGD test showed "several small gastric erosions," and that she had stomach pain and nausea during a visit in May 2015, and concluded that KLB's GERD was also severe.  R. 104–05.  The ALJ's finding that KLB's costochondritis, allergic rhinitis, and depression were non-severe is also supported by substantial evidence.  R. 25.  KLB's treating physicians, Dr. Epstein and Dr. Smith, did not mention costochondritis in their brief opinion letters.  R. 706, 712.  In those letters, only Dr. Smith mentioned depression, and only Dr. Epstein mentioned allergic rhinitis.  R. 706, 712.  The state agency psychologist, Dr. Walter,

noted that KLB was not in counseling as of June 2015. R. 104, 106.

**C.    Step Three – The ALJ did not err in determining that KLB did not meet or functionally equal a listing.**

A claimant may establish disability by showing that her impairments, singly or in combination, meet or medically or functionally equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B. This requires consideration of all the claimant's impairments, including those that are considered non-severe.   20 C.F.R. §§ 416.911(b), 416.923, 416.924(a), 416.924a(b)(4), 416.926a(a) and (c).  As noted in 20 C.F.R. § 416.925(a), Part B includes listings which describe "impairments that cause marked and severe functional limitations" that are disabling for children. A claimant's impairment or combination of impairments must satisfy "all the criteria" of that listing. 20 C.F.R. § 416.925(d); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (noting that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify"). A plaintiff bears the burden of showing the relevant criteria are met, and must present medical findings "at least equal in severity and duration to the criteria" for the most similar, listed impairment. 20 C.F.R. § 416.926(a); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

**1.    KLB did not meet or medically equal any asthma or digestive system listings.**

The ALJ's finding that KLB's impairments or combination of impairments did not meet or medically equal a listing is supported by substantial evidence.  To meet a particular listing, a claimant's impairment or combination thereof must satisfy "all of the criteria" of that listing. 20 C.F.R. § 416.925(d). Medical equivalence to a listing means that the claimant has "other findings related to [his/her] impairment that are at least of equal medical significance to the required criteria," when the claimant either does not exhibit all of the findings specified in the listing, or exhibits all of the required findings but not at the level of severity specified in the listing. 20 C.F.R. § 416.926(b)(1).

32

The ALJ concluded that KLB's impairments did not meet or medically equal the relevant listings for respiratory system, section 103.00, asthma, section 103.03, or digestive system, section 105.00, apparently because her medical records did not establish that she met the criteria for those listings. R. 25–29. "In evaluating a claimant's impairment, an ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)). If an ALJ's opinion as a whole provides substantial evidence to support the step-three decision, "such evidence may provide a basis for upholding the ALJ's determination." *Reavis v. Colvin*, 3:13cv149-HEH, 2014 WL 546106, at *20 (E.D. Va. Feb. 10, 2014) (citing *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011)). The Court accordingly considers the evidence that KLB did not meet or medically equal the asthma and digestive systems listings referenced by the ALJ.

"Asthma is a chronic inflammatory disorder of the lung airways that we evaluate under [section] 103.02 or 103.03." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 103.00G. The listing for asthma, section 103.03, requires three hospitalizations within a one-year period:

> Asthma (see 103.00G) with exacerbations or complications requiring three hospitalizations within a 12–month period and at least 30 days apart (the 12–month period must occur within the period we are considering in connection with your application or continuing disability review). Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization. Consider under a disability for 1 year from the discharge date of the last hospitalization; after that, evaluate the residual impairment(s) under 103.03 or another appropriate listing.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 103.03.

The evidence in the record supports the ALJ's conclusion that KLB did not meet the asthma listing, because she was only admitted to a hospital three times between 2013 and 2017, and her admissions did not occur within a 12-month period. The ALJ noted that KLB was "hospitalized

three times for a few days each time in the past." R. 28. One of those hospital admissions, in 2014, was apparently unrelated to her asthma, and was instead due to an allergic reaction to IVP dye. R. 257–58.

The evidence also supports the ALJ's conclusion that KLB did not medically equal the asthma listing. KLB's visits to her primary care physician, pulmonologist, and the emergency room for asthma-related complaints, although sometimes occurring in close proximity, are not of equal medical significance to a two-day minimum hospital admission. R. 28. Her treating physicians determined that her asthma symptoms could be managed at home with occasional emergency interventions, such as Albuterol treatments, that apparently resolved her symptoms to the satisfaction of her doctors without requiring treatment in a hospital. She could go for several months between an asthma event that required treatment in an urgent care clinic or doctor's office. *See* R. 464, 602, 617, 641–42, 653, 655, 663, 751, 897 (showing months between flare-ups in 2015 and 2016). In light of these gaps between flare-ups, the ALJ may have overestimated the frequency of KLB's visits to the doctor by finding that she "see[s] her doctor every month or two." R. 28.

The ALJ's conclusion that KLB did not meet or medically equal any of the digestive systems listings in section 105.00 is also supported by substantial evidence. The potential listings in this section are: (1) section 105.02, gastrointestinal hemorrhaging from any cause, requiring blood transfusion; (2) section 105.05, chronic liver disease; (3) section 105.06, inflammatory bowel disease documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings; (4) section 105.07, short bowel syndrome due to surgical resection of more than one-half of the small intestine; (5) section 105.08, growth failure due to any digestive disorder; (6) section 105.09, liver transplantation; and (10), section 105.10, need for supplemental daily enteral feeding via a gastronomy due to any cause. 20 C.F.R. Pt. 404, Subpt. P., App. 1

34

§§ 105.01 through 105.10.  There is not a listing for GERD, and KLB's GERD and occasional vomiting do not meet or equal any of these listed conditions.  Instead, the ALJ found that the "medical records indicate that [KLB's] GERD is under control."  R. 28.  Controlled GERD would not meet or medically equal any of the digestive systems listings.

### 2.    KLB did not functionally meet a listing.

If the claimant's impairment or combination of impairments does not meet or medically equal a listing, the ALJ next considers whether they "functionally equal the listings."  20 C.F.R. § 416.926a(a).   The ALJ evaluates functional equivalence by reviewing all the relevant information in the claimant's case record to assess how the impairment affects the child's functioning in six separate "domains."  20 C.F.R. § 416.926a(b).

As described above, an impairment or combination of impairments functionally equals a listing when there is a marked limitation in two domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a(a), (e)–(l).  In deciding whether a child claimant has a "marked" or an "extreme" limitation, SSA "will consider [the claimant's] functional limitations resulting from all of [his or her] impairments, including their interactive and cumulative effects."  20 C.F.R. § 416.926a(e)(1)(i).  It is the responsibility of the ALJ to determine functional equivalence.  20 C.F.R. § 416.926a(n).  "Marked" indicates an impairment that seriously interferes with the ability for independently initiating, sustaining, or completing activities.  20 C.F.R. § 416.926a(e)(2)(i). "Extreme" means a child has an impairment that very seriously interferes with a child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(3)(i).  "'Extreme' limitation is the rating [given] to the worst limitations," but it "does not necessarily mean a total lack or loss of ability to function."  *Id.*  If a claimant establishes functional equivalence and duration, then disability benefits are awarded.  20 C.F.R. § 416.924(d)(1).

35

Before addressing whether KLB had a marked or extreme limitation in any of the six domains of functioning, the ALJ extensively reviewed the medical evidence, the non-medical evidence, the school and therapy records, the opinions of Dr. Smith and Dr. Epstein and the state agency consultants, the hearing testimony, KLB's daily activities of living, and the effect of all of her combined conditions, including her asthma, GERD, and obesity, on her functioning. R. 26-29. The ALJ then analyzed how KLB functioned in terms of the six domains detailed below. R. 29–35. The six domains are assessed using a four-point scale: "'extreme, marked, less than marked, or no limitation.'" *Blaine v. Astrue*, No. 4:09CV104, 2010 WL 3291824, at *7 (E.D. Va. June 3, 2010) (citation omitted), *report and recommendation adopted*, No. 4:09CV104, 2010 WL 3291825 (E.D. Va. Aug. 18, 2010).

### i.    Acquiring and Using Information

The SSA is required to "consider how well [a claimant] acquire[s] or learn[s] information, and how well [a claimant] use[s] the information" she has learned. 20 C.F.R. § 416.926a(g). A school-age child, between the ages of 6 and 12, "should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). She should also be able to use these skills in an academic situation to demonstrate what she has learned, such as by reading and producing oral and written projects, by working in a group, by entering into class discussions, and by working through mathematical problems. *Id.* An adolescent child, between the ages of 12 and 18, should continue to demonstrate what she has learned in academic assignments, such as through composition, classroom discussion, and laboratory experiments.    20 C.F.R. § 416.926a(g)(2)(v). She should be able to use what she has learned in daily living situations without assistance, such as by going to the store, using the library, and using public transportation. *Id.* The child should be able to comprehend and express both simple and complex ideas, and apply

36

these skills in practical ways that will help her enter the workplace, such as by carrying out instructions, preparing a job application, or being interviewed by a potential employer. *Id.*

Substantial evidence supports the ALJ's finding that KLB had no limitations in this domain. R. 30. KLB had no history of special education needs or a need for accommodations based on academic or intellectual reasons. The ALJ noted that school records reflect that KLB generally earned grades from A's to C's that remained in the same range over the years, and, at the hearing, KLB testified that she completed her homework independently, with occasional help from her sisters. R. 27, 30, 51–52. A function report completed by Johnson in 2014 stated that KLB had no problems hearing or communicating, and her learning ability was not limited. R. 176–80. There was no evidence that KLB demonstrated any of the non-exclusive examples of limitations for this domain, such as not understanding comparative words, inability to rhyme, difficulty recalling things recently learned in school, or difficulty explaining what she means. 20 C.F.R. § 416.926a(g)(3).

### ii.    Attending and Completing Tasks

In this domain, SSA considers a claimant's ability to focus and maintain attention and her ability to "begin, carry through, and finish [her] activities, including the pace at which" such activities are performed and how changes to the same are handled. 20 C.F.R. § 416.926a(h). A healthy school-age child "should be able to focus [her] attention," follow instructions, organize her school work, and complete assignments. 20 C.F.R. § 416.926a(h)(2)(iv). She should also be able to focus on details and avoid careless mistakes avoided by others of her age, change her activities or routines, and stay on task and in place when appropriate. *Id.* Finally, she should be able to transition between events and activities and sustain her attention sufficiently to read by herself, complete family chores, and participate in group sports. *Id.*

An adolescent child should be able to pay attention to increasingly longer presentations and discussions, as well as maintain concentration while reading textbooks. 20 C.F.R. § 416.926a(h)(2)(v). She should be able to independently plan and complete long-range projects, organize materials and plan her time, and maintain attention on a task for an extended period of time without being unduly distracted by others or unduly distracting them. *Id.*

Substantial evidence supports the ALJ's finding that KLB had no limitations in this domain. R. 31. The ALJ noted that KLB completes her homework when she gets home from school without any reminders, although she may wait to begin until her sister is also home. R. 27, 51–52. She also manages her time and organizes her school work and other activities, such as making her bed in the morning, and spending school nights after dinner by taking a bath, preparing her clothes for school, and studying. R. 27, 55–56. She helps by making grocery lists for the family, but does not participate in group sports (such as volleyball or cheerleading) or family chores due to physical limitations. R. 27, 56, 63–64. There is no evidence that she has any difficulty paying attention at school or at home.

### iii. Interacting and Relating with Others

In this domain, the SSA considers a claimant's ability to "initiate and sustain emotional connections with others, develop and use the language of [her] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). Healthy school-age children should be able to form durable friendships with one or more of their peers, to learn how to work with others on projects and problem solving, to better understand the points of view of others and accept differences, and to talk with, tell stories to, and speak with others of all ages in a manner that can be readily understood. 20 C.F.R. § 416.926a(i)(2)(iv).

38

An adolescent child should be able to initiate and develop friendships with her peers and relate appropriately to people of all ages, both individually and in groups. 20 C.F.R. § 416.926a(i)(2)(v). She should start to be able to solve conflicts, recognize the different social rules between age groups, intelligibly express their feelings, seek help or information, and describe events or tell stories in all kinds of environments with all kinds of people. *Id.*

There is substantial evidence to support the ALJ's finding that KLB had less than marked limitation in this domain. R. 32. The ALJ correctly noted that KLB suffered from some physical limitations related to this domain, such as not taking part in PE class and not going out on the weekends with her school friends or family because she cannot keep up with them. R. 32, 53–55, 69–70. However, the ALJ also noted that she "does not appear to have any limitation in social skills," she has friends, she has no problems interacting with her family or authority figures, and she has no behavioral or communication problems. R. 32.

The evidence supports the ALJ's conclusion that KLB's physical limitations cause some, but less than marked, limitation in this domain, because the focus of this domain is a claimant's ability to relate to and interact with other people, and the evidence shows no limitation in her abilities in those respects. For instance, there is no evidence that KLB demonstrated any of the non-exclusive examples of limitations for this domain, such as not having friends, withdrawing from people she knows, difficulty playing games with rules, or difficulty speaking or communicating. 20 C.F.R. § 416.926a(i)(3).

### iv.   Moving About and Manipulating Objects

This domain considers how well a child moves her body from place to place and how the child moves and manipulates objects. 20 C.F.R. § 416.926a(j). In essence, this domain evaluates the child's gross and fine motor skills. *Id.* A school-age child should be able to move at an efficient

pace throughout her school, home, and neighborhood. 20 C.F.R. § 416.926a(j)(2)(iv). The child's

increasing strength and coordination should increase her ability to enjoy a variety of physical

activities, and her fine motor skills should enable her to use many kitchen and household tools

independently. *Id.* An adolescent should be able to use her motor skills to freely and easily "get

about [her] school, the neighborhood, and the community," and to "participate in a full range of

individual and group physical fitness activities." 20 C.F.R. § 416.926a(j)(2)(v). She should also

"show mature skills in activities requiring eye-hand coordination, and should have the fine motor

skills needed to write efficiently or type on a keyboard." *Id.*

There is substantial evidence in the record to support the ALJ's finding that KLB has less

than marked limitation in this domain. For example, the ALJ noted that KLB uses electronic

devices for social media, she can hand-write school assignments, and she is able to move around

at home and at school. R. 27, 31, 34, 48–49, 54–55. The ALJ also noted that KLB has a variety

of limitations in this domain, such as receiving additional time to move between classes, shortness

of breath and the need for rest breaks when climbing stairs and performing personal care activities,

and an inability to participate in exertional activities in PE class. R. 27, 33, 49, 55–56, 58–59, 203.

The ALJ noted that, although KLB was provided an additional five minutes to transition between

classes in her one-story school, she generally did not need more than two minutes. R. 27, 48–49,

62. The ALJ noted that KLB can climb the stairs in her home with a break, and that she bathes

herself and prepares her clothes at night.[8]  R. 27.  The ALJ also found that the "statements

concerning the intensity, persistence, and limiting effects of [KLB's] symptoms are not entirely

---

[8] As further evidence to support the ALJ's conclusion that KLB's limitations in this domain were less than marked, it appears that Dr. Epstein's statement regarding KLB's inability to "walk stairs effectively at school" in her September 5, 2016 letter did not explain that limitation in the context of KLB's one-story school. R. 49, 712.

consistent with the medical evidence and other evidence in the record." R. 28.

Overall, the record supports the decision that KLB has some limitations in moving about and manipulating objects, and the ALJ marshalled enough support from the record for her determination that those limitations were less than marked to satisfy the deferential substantial evidence test. For instance, the evidence suggests that KLB only experiences one of the non-exclusive examples of this domain – trouble climbing stairs – but not the others, which address gross motor movements, joint stiffness, balance, muscle weakness, loss of sensation, hand-eye coordination when writing or using scissors, and fine motor movements. 20 C.F.R. § 416.926a(j)(3).

### v.    Caring for Self

This domain considers how well a child can maintain a healthy emotional and physical state, including how well the child gets her physical and emotional wants and needs met in appropriate ways, how the child copes with stress and environmental changes, and whether the child takes care of her own health, possessions, and living area. 20 C.F.R. § 416.926a(k). A school-age child should be independent in day-to-day activities, such as in dressing or bathing herself, but may still need to be reminded to do these things routinely. 20 C.F.R. § 416.926a(k)(2)(iv). The child should be able to identify those situations where she feels good about herself and those where she feels bad. *Id.* She should begin to develop an understanding of right and wrong and of acceptable and unacceptable behavior. *Id.* She should start to demonstrate consistent behavioral control, and avoid unsafe or unwise behavior. *Id.*

An adolescent should become increasingly independent in day-to-day activities and should begin to notice significant changes in her body's development. 20 C.F.R. § 416.926a(k)(2)(v). She should begin to discover appropriate ways to express feelings, think seriously about future

plans, and about what she will do upon finishing school. *Id.*

There is substantial evidence to support the ALJ's finding that KLB has less than marked

limitation in this domain. R. 34. The ALJ noted that KLB takes care of her daily dressing and

bathing without reminders, and she is thinking about future careers, such as nursing. R. 27–28,

53, 56. As the ALJ observed based on Johnson's reports, KLB's limitations in this domain stem

from taking breaks while bathing and dressing due to shortness of breath. R. 27, 34, 56, 203.

Johnson maintains and regulates KLB's medications for her, but KLB otherwise appears to be

independent concerning self-care, and does not have behavioral problems. R. 34, 55–56. The ALJ

also found that KLB's counseling has helped her understand her differences and address her

depression. R. 28, 61.

### vi.    Health and Physical Well-being

In this domain, SSA considers the cumulative physical effects of the child's impairments

on the child's health and functioning that were not considered in evaluating the child's motor skills.

20 C.F.R. § 416.926a(l). This domain does not address a child's abilities, but rather addresses how

chronic illnesses, medication, or the need for recurrent treatment may impact a child's health and

physical well-being. *Id.*

> In this domain, SSA may consider a claimant's limitation to be "marked" if she is:
>
> frequently ill because of [his/her] impairment(s) or ha[s] frequent exacerbations of
> [her] impairment(s) that result in significant, documented symptoms or signs. For
> purposes of this domain, "frequent["] means that [the claimant] ha[s] episodes of
> illness or exacerbations that occur on an average of 3 times a year, or once every 4
> months, each lasting 2 weeks or more. We may also find that [a claimant] ha[s] a
> "marked" limitation if [she] ha[s] episodes that occur more often than 3 times in a
> year or once every 4 months but do not last for 2 weeks, or occur less often than an
> average of 3 times a year or once every 4 months but last longer than 2 weeks, if
> the overall effect (based on the length of the episode(s) or its frequency) is
> equivalent in severity.

20 C.F.R. § 416.926a(e)(2)(iv).

SSA may consider a claimant to have an "extreme" limitation in this domain if she is:

frequently ill because of [her] impairment(s) or have frequent exacerbations of [her] impairment(s) that result in significant, documented symptoms or signs *substantially in excess of* the requirements for showing a "marked" limitation in paragraph (e)(2)(iv) of this section. However, if [she has] episodes of illness or exacerbations of [her] impairment(s) that [SSA] would rate as "extreme" under this definition, [her] impairment(s) should meet or medically equal the requirements of a listing in most cases.

20 C.F.R. § 416.926a(e)(3)(iv) (emphasis added).

There is substantial evidence to support the ALJ's determination that KLB has a marked, but not an extreme, limitation in the health and well-being domain. R. 35; *see Perkins ex rel. J.P. v. Astrue*, 32 F. Supp. 3d 334, 340 (N.D.N.Y. 2012) ("Although a reasonable person might review the evidence and assess an extreme impairment as to [a] domain . . . this Court cannot impose its own views where, as here, the Commissioner's judgment [finding a marked limitation] is based upon adequate findings supported by the evidence.").

KLB has limitations in her physical activity due to her asthma, such as not participating in PE class activities, having to pause for rest when dancing to exercise videos, and resting after climbing stairs. R. 28, 55–56, 58–59. Her asthma medications make her feel tired, but she still performs well in school despite her absences. R. 35, 59–61. The evidence supports the ALJ's determination that her asthma exacerbations do not occur "frequently" as defined by SSA regulations above, because they do not occur every four months and last for two weeks, but that KLB still has a marked limitation because she had asthma exacerbations more often than three times per year that lasted less than two weeks each. R. 28, 35. The ALJ correctly noted that KLB's symptoms are fairly well controlled with home treatment, but she occasionally requires urgent care visits or emergency room visits for asthma flare-ups. R. 35.

The evidence supports the ALJ's conclusion that the number and severity of KLB's asthma

flare-ups and GERD episodes reflect a marked, but not extreme, limitation. First, KLB's conditions only required three hospital admissions over the course of three years, and one of those admissions was apparently due to an allergic reaction to IVP dye, rather than asthma or GERD. R. 257–62, 342–48, 785–87, 805.

Second, KLB's emergency room and urgent care visits occurred, on average, three times per year over three years. She had one visit in December 2013, and then two visits in August 2014 and one visit in October 2014. R. 246–52, 264–65, 355. The first two of these visits were resolved by an Albuterol nebulizer treatment, the third was treated with ibuprofen, and the last visit for chest pain was resolved with a "GI cocktail." *Id.* She had no emergency room or urgent care visits in 2015. Instead, over a year and half passed before her two next urgent care visits, which occurred on July 9 and 12, 2016, and her coughing and wheezing were resolved. R. 751–58, 766–68. Her next two urgent care visits occurred four months later, on November 9 and 21, 2016; both of those visits were resolved by prescribing Albuterol treatment at home. R. 726–27, 818–20. In her last emergency department visit, in January 2017, she was treated for asthma and advised to follow up with her doctor in two days. R. 854.

Third, KLB's doctor visits do not demonstrate more than a marked limitation, because her exacerbations did not occur substantially more often than three times in a year, or once every four months, each lasting for two weeks or more. 20 C.F.R. § 416.926a(e)(2)(iv), (e)(3)(iv). As summarized below, several of her doctor visits were follow-up appointments with no reported problems or consultations. Generally, her asthma flares and stomach problems generated a few visits in close proximity, followed by months-long gaps before additional treatments were needed to address a flare-up.

Of approximately sixteen visits in 2014, five visits were follow-up appointments with no

new concerns, one visit was a follow-up that noted KLB experienced a cough for several days, and one appointment was an evaluation. R. 274 (September 4), 278 (October 8), 362–63 (August 25 and September 24), 367 (June 24), 413 (October 29 evaluation), 464–65 (December 24). The first four other visits in February and March variously noted shortness of breath, chest pain, stomach pain, wheezing, and sore throat, but on two of those visits, the doctors noted that KLB was not compliant with her medication. R. 368 (March 18), 370 (March 10), 372–74 (February 12), 477 (March 4). The next visit in April recounted the history of KLB's symptoms and she was prescribed daily Advair and Albuterol as needed. R. 269–70. Her next two asthma visits were four months later, in August after an emergency room visit, and Dr. Epstein increased the Advair dosage and resolved KLB's coughing with Albuterol. R. 272–73 (August 7), 365 (August 11). Her last two visits in 2014 were on October 30, where KLB complained of shortness of breath, and December 2, for a cough, fever, chest and stomach pain. R. 280, 466.

In 2015, KLB had approximately sixteen doctor visits, of which three were follow-ups with no cough or wheezing, R. 428 (February 23), 533 (July 27), 661 (August 10), one was a bronchoscopy procedure, R. 420, 426, one was an impedance probe for testing GERD, R. 567, 574, one was an EGD test, R. 643, and one was a gastroenterologist consultation, R. 417. She had a visit for an asthma flare on March 4, after her medications ran out. R. 463. She had a visit for congestion in April, R. 461, in May for a viral illness and vomiting, R. 435, and in June for chest pain, GERD, and increased cough and wheezing, R. 530. KLB had two other asthma visits, in September when she reported more symptomatic asthma, and November, where she reported good and bad weeks and an improved pulmonary function test. R. 602, 641. KLB also had three gastroenterologist and GERD-related visits, for chest and stomach pain and twice-weekly vomiting in May, R. 431, abdominal pain in August, R. 556–57, and chest pain, shortness of breath during

exercise, and vomiting every few days in December, R. 620.

In 2016, KLB had approximately fifteen visits, four of which were follow-up visits with no significant shortness of breath, R. 617 (March 24), 662–63 (June 22), 897 (June 29), 838 (November 2), and one of which was an allergy test. R. 843–46 (September 28). Four other visits were for stomach pain and/or vomiting once or twice a week. R. 627 (January 11), 614 (April 4), 892 (June 27), 746 (November 14). In two visits in January and February, Dr. Epstein noted KLB was using Albuterol twice weekly and that vomiting triggered her asthma, and Dr. Smith noted that KLB's asthma was better recently. R. 599, 655. KLB had two visits in early March for an asthma flare, but she was feeling much better at her third visit at the end of March. R. 617, 623, 653. KLB had two visits in April for chest and stomach pain. R. 614 (April 4), 652 (April 15). She went for the follow-up and stomach visits described above in June, two months later, and then had a visit approximately four months later, on November 2, because she complained of coughing and wheezing, although Dr. Epstein found she did not have significant shortness of breath or abdominal or GERD symptoms. R. 838. Her last visit, on December 7, was an asthma treatment at which Dr. Smith increased her prescription for Qvar in the event of an asthma flare. R. 657.

In January 2017, KLB had three visits for coughing and wheezing and an asthma exacerbation. R. 852, 864–65.

Furthermore, although there was some evidence that KLB's GERD symptoms were not completely under control as of her hearing, her only dietary restrictions were eggs and spicy foods, and she was taking medication for her symptoms, which flared up during asthma exacerbations. R. 57–58, 67–69. She was seeing a therapist for negative cognition, but did not require medication or other more intensive treatment for her depression. R. 61, 708–10. The state agency physicians and psychologist all agreed that KLB did not have extreme limitations; in fact, Dr. Duff and Dr.

46

Walter noted that KLB had less than marked limitation in the health and physical well-being domain. R. 106. And, as noted above, there is substantial evidence to support the determination that KLB did not meet or medically equal a listing, as would be expected for a finding of an "extreme" limitation. *See* 20 C.F.R. § 416.926a(e)(3)(iv).

Finally, KLB's symptoms are similar to those that have been classified as less than marked in the health and well-being domain. Although reasonable people may disagree about the severity of a limitation, this Court cannot impose its own views when the agency's decision is supported by the evidence, and the facts in comparable cases categorizing limitations demonstrate that the agency's conclusion here was properly supported. *See Perkins*, 32 F. Supp. 3d at 340.

For example, a ninth-grade student with uncontrolled diabetes, asthma, abdominal pain, fatigue, dizziness, and depression and anxiety was found to have less than marked limitation in domain six. *Lavigne ex rel. F.L. v. Barnhart*, No. 705CV00043, 2006 WL 318610, at *6–8 (W.D. Va. Feb. 8, 2006). The student in that case experienced asthma attacks one to three times per week, had uncontrolled diabetes, experienced intermittent stomach pains that responded to medication when she suffered from nausea and vomiting, and claimed to have suicidal ideation and hear voices. *Id.* at *1, *5, *7. She also had a variety of accommodations, including a homebound instruction plan due to stomach problems and suicidal ideation, and an accommodation plan in school to excuse her from PE class when she had an asthma attack. *Id.* at *1, *5. The ALJ found that she functioned fairly well, her homebound instruction allowed her to combat difficulties at school, and her academic performance was unaffected. *Id.* at *6. The court affirmed the ALJ's decision upholding the agency's decision that the student had a less than marked limitation in domain six. *Id.* at *7–8. The court noted that the student scored in the "moderate difficulty in functioning" range on a psychological and social function test and that, despite the student's

mother's claim that the student was frequently ill due to her asthma and diabetes, those conditions were "well-controlled by treatment when it is followed." *Id.*

KLB's conditions are similar to those of the student in *Lavigne*, as both girls experienced asthma exacerbations alongside other symptoms, and both had accommodation plans involving home instruction and PE class. Like the student in *Lavigne*, KLB's academic performance has been relatively unaffected over the years that she has experienced symptoms. Given the relative similarities in the record in this case and *Lavigne*, the conclusion that there was substantial evidence to uphold a less than marked limitation in *Lavigne* further supports the ALJ's finding here that KLB's impairments constitute a marked, but not an extreme, limitation in the sixth domain.

Because plaintiff has not demonstrated marked limitations in two domains or an extreme limitation in one domain, the Court finds no basis to overturn the ALJ's finding that KLB's impairments or the combination thereof do not functionally equal a listing.

**D.    The information in the summary judgment motion does not support a remand.**

When reviewing an ALJ's decision, district courts "cannot consider evidence which was not presented to the ALJ." *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996). Accordingly, the Court cannot consider the facts in plaintiff's motion for summary judgment relating to developments after the ALJ hearing, such as declining grades, a prescription for hypertension in May 2018, glaucoma surgeries in July 2018 allegedly related to steroid use, and a hospitalization for acid reflux in August 2018. ECF No. 15.

Plaintiff has not requested a remand for consideration of this additional evidence, which arose after the ALJ's decision. Notwithstanding this, a "court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that

48

there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g). However, in order to submit new evidence to the Appeals Council after an ALJ issues a decision, such evidence also must "relate[] to the period on or before the date of the [administrative law judge] hearing decision." 20 C.F.R. § 404.970(a)(5), (b). To the extent plaintiff attempts to present new or additional evidence, it does not relate to the period before the date of the ALJ hearing. Plaintiff has not met the statutory conditions required to support a remand of this matter to the Commissioner.

## VII.   RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 15) be **DENIED**, defendant's motion for summary judgment (ECF No. 17) be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

## VIII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or

specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June *10*, 2019